**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William WILLIS, a/k/a William Benton Ziegler, Omar Ashad Mahdi, Defendants-Appellants.**

No. 83–7651.

United States Court of Appeals, Eleventh Circuit.

April 23, 1985.

Rehearing and Rehearing En Banc Denied June 4, 1985.

David B. Byrne, Jr., John M. Bolton, III, Montgomery, Ala., for Willis.

J. Mason Davis, Sirote, Permutt, Friend, Friedman, Held & Apolinsky, Birmingham, Ala., for Mahdi.

Mark Kadish, Alan J. Baverman, Atlanta, Ga., for defendants-appellants.

John C. Bell, U.S. Atty., Charles Truncale, Asst. U.S. Atty., Montgomery, Ala., for plaintiff-appellee.

Before HENDERSON and HATCHETT, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

ALBERT J. HENDERSON, Circuit Judge:

William Willis, also known as William Benton Ziegler (Willis), and Omar Ashad Mahdi appeal from convictions for conspiring to import, importing, conspiring to possess with intent to distribute and possessing with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846, 952 and 963. We affirm.

On August 3, 1983, at around 9:45 p.m. a twin-engine Piper Navajo, an expensive passenger plane, landed at Montgomery Airport's Dannelly Field and taxied onto the runway of Montgomery Aviation, a fixed base operation used primarily by private aircraft. Two linemen, Todd Stettler and Ken Moseley, used "light wands" and a flashlight to signal the Piper that it should park in a well-lit space next to the terminal building. Instead, the plane continued to the opposite end of the parking ramp, halting in a dark spot over one hundred yards from the building. R.Vol. 10 pp. 204–07. In the experience of the linemen it was very unusual for a plane to disobey parking signals, especially at that time of night. *Id.* p. 295. Moseley proceeded toward the aircraft. A white male, later identified as David Joseph Newcomb, crawled out through a small door on the pilot's side of the cockpit and intercepted Moseley about halfway between the plane and the building. Moseley asked if the Piper needed fuel, and Newcomb replied affirmatively, adding that he needed to use a phone. Newcomb said that someone would be out to unload the aircraft later that night, but that the plane might not remain overnight. Moseley then took Newcomb to a phone inside the terminal building. *Id.* pp. 269–70.

Meanwhile, Stettler had returned to Montgomery Aviation's office. There he was approached by a black male, later identified as the appellant Mahdi, who ordered fuel for the Piper. Mahdi filled out an order slip specifying the plane's tail number, an owner's name ("CIB Auto"), partial address ("Nashville Tennessee"), pilot's name ("Ron Allen"), and schedule ("Plan to depart"). *Id.* pp. 209–10, 219. Mahdi and Newcomb apparently slipped away unob-

* Honorable Philip Nichols, Jr., U.S. Circuit Judge for the Federal Circuit, sitting by designation.

served shortly afterwards, leaving no further instructions.

Moseley walked toward the aircraft while Stettler went to get the fuel truck. As they approached the plane, they noticed that its rear was heavily overloaded. *Id.* p. 211. They also observed that the plane had undergone a "Panther Conversion," a distinctive series of engine and propeller modifications costing approximately $100,-000.00, which increase the flying range and engine capacity of the aircraft. R.Vol. 10 p. 212, Vol. 12 pp. 760–61, Vol. 13 p. 936. While Stettler readied the fuel truck hose, Moseley used the truck's six-foot ladder to reach the cockpit windows, shining his flashlight on them to check for dirt before washing them, a routine service. To his surprise, Moseley saw that the cabin seats of the luxury passenger plane were filled with large green duffel bags stuffed with hard, football-sized packages. He also noticed a five-man life raft. All window curtains on the Piper appeared tightly drawn. After consulting with Stettler, who also viewed these conditions, Moseley alerted airport security. The linemen did not refuel the plane. R.Vol. 10 pp. 210–12, 271–73.

Tyrone Anderson, a narcotics officer of the Alabama Bureau of Investigation (ABI), soon arrived. After hearing the linemen's accounts of their observations, he looked through a gap in the curtains on a rear window of the plane and saw the duffel bags and raft. His extensive experience with narcotics investigations told him that the particular type of bags and shape of packages strongly indicated the presence of a huge amount of cocaine. R.Vol. 8 pp. 67–70.

About 10:20 p.m. Stettler left for home. On the way he saw Mahdi walking along the road, away from the airport. Stettler returned to Montgomery Aviation and so informed Anderson. Anderson, Stettler and Moseley then sought the aid of state trooper Steve Dixon and his car to search for Mahdi. After a short time, Dixon dropped Anderson and Moseley off at the airport. Dixon and Stettler continued searching and soon found Mahdi, whom Stettler readily identified, walking along the same road but in the direction of the airport. Dixon pulled over and asked Mahdi for identification. Mahdi supplied a drivers license. Dixon then had Mahdi return with him to Montgomery Aviation. Mahdi rode in the back seat of Dixon's patrol car. R.Vol. 10 pp. 213–16.

Upon their arrival at Montgomery Aviation, Anderson instructed Mahdi to move to Anderson's car. There Mahdi, while being read his *Miranda* rights, said he thought the plane contained only mail. After hearing his rights, Mahdi told Anderson that although he was a commercial pilot, the other man, whom Mahdi claimed to know only as "Ralph," had flown the Piper. Mahdi had met the plane in Louisiana, agreeing to accompany the pilot on the flight for $500.00. When he realized the pilot had left Montgomery Aviation, Mahdi assumed he was renting a car. But on his way to the rental agencies Mahdi realized they would be closed and started to return to the airport terminal. Mahdi suggested that Anderson break into the plane and offered to help him. R.Vol. 3 p. 728; Vol. 8 pp. 83–115.

At 10:30 p.m. Lieutenant Bradford of the ABI arrived on the scene, receiving a full account from Moseley. When two more ABI officers, Rhegness and Ward, appeared around 10:40 p.m., Bradford briefed them on the events. Before leaving to check local motels, Rhegness and Ward discovered that the owner's name listed by Mahdi on the fuel order was false.

In response to a call from Rhegness, Sergeant Supervisor Randall Brown of the Montgomery Police Department arrived at 11:40 p.m. By that time several police cars, at least one of which was a marked state trooper unit, had been moved near the plane, their headlights shining on its front and forward right side. Standing at the gate next to Montgomery Aviation's office, between 100 and 140 yards from the plane, Brown had an unobstructed view of this scene. He could see several persons, including a uniformed state trooper, moving around the plane, though he could not identify them individually. R.Vol. 11 pp. 389–91, 405–07. Brown walked to the

plane, received all the information from Bradford and went to use the office telephone. The office had two large glass windows and a glass door permitting a view of both the gate and the plane.

At midnight Brown was still on the phone, his left side turned to the windows. Brown saw a cab pull just inside the gate. A bearded white male, later identified as Willis, stepped out from the passenger side and stood next to the front door. From this spot he had essentially the same view as did Brown from his position. Willis looked in the direction of the lighted plane, police and cars, then turned and looked at Brown, making eye contact. Brown was dressed in ordinary slacks, shirt and tie but also wore his police badge. On the counter next to Brown was his hand radio. Brown's gun was holstered on his right side and therefore was not visible to Willis. Willis immediately got back into the cab and left the airfield. R.Vol. 11 pp. 389–91, 393–410. Brown went to his car, radioed for a marked unit to stop the cab and immediately followed the taxi. Several miles from the airport, he pulled in behind the stopped cab and a police car at about 12:10 p.m. *Id.* p. 411–12.

Brown questioned the cab driver, Tommy Smith, who said he had picked up Willis in front of the Howard Johnson's motel, which was only half a mile from that point. Willis had told Smith he was meeting a passenger coming from Nashville at midnight. Smith had driven to the main terminal, but after a brief wait Willis asked to go to Montgomery Aviation. When the cab pulled inside Montgomery Aviation's gate, Willis got out, then got back in, said he was hungry and told Smith to take him back to the motel. R.Vol. 6 pp. 11–13; Vol. 8 pp. 214–15, 231–32.

Brown then approached the cab, asked Willis to step out, patted him down for weapons, told him there was a problem at the airport and asked him for identification. Willis supplied his drivers license. In response to further questioning, Willis stated he had gone to the airport to meet a friend, whom he first referred to as John Jamison, then John Johnson, and was heading back to his room at the nearby Howard John-

son's. Willis explained he planned to travel with friends to a golf tournament in Mobile. Around 12:15 p.m., Rhegness and Ward pulled up, also asking for Willis' license. After he again produced the license, they read Willis his *Miranda* rights. He said he understood his rights and told them he was an independent coal broker, travelling alone on business but planning to play golf in Mobile. R.Vol. 8 pp. 260–62. He agreed to remain with Brown while they checked his story at the motel. R.Vol. 3 pp. 729–30; R.Vol. 8 p. 262.

Rhegness and Ward then proceeded to the Howard Johnson's motel, where they identified themselves as police officers to the clerk, Elizabeth Lincoln. Lincoln showed them Willis' registration card for Rooms 220, 222 and 224. Lincoln reported that Willis had registered alone, paying cash, but on the card he had specified two persons would occupy each room. While the agents examined the card and questioned Lincoln further, Newcomb walked up, interrupting their questioning to ask Lincoln for change. Noting that he fit the description of the white male who had emerged from the plane, the agents identified themselves as ABI narcotics agents and asked if he was a guest of the hotel. Newcomb answered affirmatively, then produced a key to Room 220. Rhegness then advised Newcomb of his *Miranda* rights. Upon further questioning, Newcomb claimed that he had travelled from Ft. Lauderdale to Montgomery in the car of "some guys." He did not know the make and model of the automobile and did not know William Willis. Asked how he came into possession of the key to one of Willis' rooms, Newcomb shrugged. R.Vol. 11, pp. 446–51.

Rhegness stayed with Newcomb while Ward stepped out to radio Brown requesting that he and Willis come to the motel. On the way to his car, Ward observed two men walking from the room area toward the office. He met them, identified himself as an ABI narcotics agent and asked if they were staying at the motel. One of the men, later identified as Ronald DeFranco, displayed a key to Room 224. Ward asked

the men to step inside the lobby, where he read DeFranco and his companion, later identified as Harry Dale Ziegler, their *Miranda* rights. *Id.* pp. 451–55.

When Willis and Brown arrived and entered the lobby, Ward asked if Willis knew Newcomb, DeFranco and Ziegler. Willis replied, "Yes. I know them. They are my friends. They are the ones I come up here with." *Id.* pp. 455, 464–65. The police then had the four men place their personal effects in separate piles on the lobby counter. Around 1:10 p.m., Special Agent Charles Park of the Drug Enforcement Administration (DEA) came to the motel. After Rhegness, Ward and Brown informed him of the events, Park advised the suspects of their *Miranda* rights and formally arrested them. *Id.* pp. 491–96.

Taking Newcomb's key to Room 220 and Ziegler's key to Room 224 from the counter, Park instructed the suspects to retrieve the rest of their property. The DEA agent noticed a set of car keys picked up by DeFranco. When Park took the keys, DeFranco volunteered that they fit his Buick back home in Illinois. Park tried the keys in a maroon and gray Buick with Florida license plate parked in the Howard Johnson's lot, and he found they opened the door and trunk. Upon opening the trunk, he found a suitcase, which he also opened. Inside were two night scopes. These optical instruments amplify dim light enough to permit vision in areas that to the naked eye appear dark. *Id.* pp. 496–502.

Aware that six persons were registered as guests in rooms 220, 222 and 224, but that only four men were in custody, Park, Rhegness and Ward then proceeded to the rooms. Park first knocked on 220 and received no reply. He then used Newcomb's key to enter, stepped in and saw no one was there, and left. Park repeated this entry procedure in Room 224, finding no one. *Id.* pp. 498–504. He then telephoned Room 222. A man answered, and Park identified himself as a police officer, explaining he was next door and wanted to talk face to face. The person in Room 222 said "Okay." Park and Rhegness then knocked, and a man identified as William Edward Cox opened the door. Park exhib-

ited his credentials and asked to enter, and Cox opened the door all the way, saying "Come in." When Park entered, he noted a second man, identified as Lee Curry, lying on a bed. Park also saw, sitting on the television in plain view, a cap bearing the slogan "Navajo Panther," which Park recognized as the name of the specially modified aircraft. Park asked Curry to whom the room was registered, and Curry indicated Cox. When Park asked Cox, however, he said the room was registered to "Johnson." Both Cox and Curry were then arrested. *Id.* pp. 503–05.

Pursuant to a search warrant obtained the morning of August 4, 1983, police searched the Piper Navajo and found over 800 pounds of cocaine, having a street value of approximately $230,000,000.00. R.Vol. 11 p. 532; R.Vol. 12 p. 696. Cocaine is derived from the coca plant, which is indigenous to South America. R.Vol. 12 p. 787. Also found was a Coca Cola can bearing in Spanish the inscriptions, "Keep Colombia Beautiful" and "canned under the authorization of the Coca-Cola Company by the Gaseosas Industries, Incorporated, Bogota. Registered under the Ministry of Health number 00240, a Colombian industry." *Id.* pp. 742–44. In addition, the plane contained numerous Caribbean, South American and world aeronautical charts. Mahdi's fingerprints were on many of these charts, including one with tick marks indicating a flight path over the Gulf of Mexico into Alabama. *Id.* pp. 722–27, 811–19. The aircraft also held life vests and a five-person raft, equipment customarily stored on planes flying over fifty miles or more of water. *Id.* p. 766. Police found twenty-seven of Mahdi's fingerprints and thirty-four of Cox's fingerprints within the plane. *Id.* p. 822. The aircraft registration certificate named the owner as "General Bituminous, Inc., 781 West Oakland Park Boulevard, Suite 508, Fort Lauderdale, Florida." A search of the files of the Florida Secretary of State revealed no record of any such corporation, foreign or domestic. *Id.* pp. 530–31.

Although the plane was equipped with numerous extra fuel tanks increasing its

total capacity to approximately 371 gallons, only twenty-one gallons were onboard at the time of search. The evidence disclosed that the plane as modified was capable of travelling non-stop from Colombia to Montgomery on 350 gallons of fuel. *Id.* pp. 762–66.

The personal effects of the suspects provided further evidence of their conspiracy. A key found on Willis' person fit the locks on the Piper Navajo's nose baggage compartment and side door. R.Vol. 12 p. 614. Mahdi, Newcomb and Cox carried pilots' licenses and health certificates. R.Vol. 11 pp. 509–15. Additional evidence suggested that the participants had communicated with one another by telephone.

On August 5, 1983, police towed the maroon and gray Buick, as well as a second, lighter colored Buick, also with Florida tags, to the ABI office. Search of the first car produced the suitcase containing the night scopes and various registration documents showing the car was purchased by a "William Thompson" for "Leister Corp. Inc., 15200 North Federal Highway Building 2, Suite 112, Fort Lauderdale, Florida." Registration documents in the second Buick revealed the same information. The dealer who sold the vehicles identified Willis as the purchaser. The Florida Secretary of State has no record of the Leister Corp. Inc. R.Vol. 12 pp. 667–682. Fingerprints of Ziegler were discovered in the first Buick. In the second Buick was a business card bearing the name "Ronald DeFranco." R.Vol. 11 pp. 471–74. In addition, the trunk contained a hand radio and two empty duffel bags identical to those found on the plane. R.Vol. 11 pp. 471–74.

After a lengthy suppression hearing in which the defendants challenged the admissibility of virtually all evidence in the case, the United States District Court for the Middle District of Alabama suppressed Mahdi's statements to state trooper Dixon; Willis' statements prior to being advised of his *Miranda* rights by Ward and Rhegness; and the physical evidence obtained from Rooms 220, 222 and 224, with the exception of the "Navajo Panther" cap. Following a jury trial, Willis and Mahdi were convicted on all counts and sentenced

to a total of twenty-four and fourteen years, respectively. On appeal, they claim nineteen errors in their trial.

*A. Suppression Issues*

Willis and Mahdi challenge the admission of all evidence arising from their arrests and the admission of various physical evidence as violative of the fourth amendment ban on unreasonable searches and seizures.

■ By the time Stettler had returned to report sighting Mahdi on the highway, police had probable cause to believe that the plane was involved in an ongoing crime. "Probable cause ... exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir.1983). A reviewing court may examine the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation. *E.g., United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir.1984). The level of communication among the investigating officers here is more than enough for us to aggregate the officers' knowledge at any given moment.

■ We agree with the district court that the odd parking of the Piper Navajo would create in reasonable minds a suspicion of illegal activity. By ignoring the linemen's plainly visible signals to stop in a convenient, well-lighted space and halting instead in a remote dark spot on the far end of the ramp, over one hundred yards from the office, the pilots obviously intended to prevent even casual inspection of the aircraft. In fact, Stettler testified he could not remember an instance when a plane ignored his signals. R.Vol. 5 p. 27; Vol. 10 p. 295. The tightly closed curtains evinced a suspicious intent to conceal the contents of a visibly heavily loaded plane. The conduct of the occupants also evidenced a suspicious intent. Newcomb intercepted Moseley, the lineman, before Moseley

reached the plane. Then, leaving only incomplete directions for servicing the plane, Mahdi and Newcomb soon disappeared. The stuffed duffel bags in the passenger seats of the luxury passenger plane strongly suggested drug smuggling. The authorities learned that the ownership information provided by Mahdi on the fuel order was false. Finally, the officers recognized in these and additional details a behavior pattern typical of those who import cocaine by air. The officers' previous experience included a May 1983 seizure at Dothan, Alabama, of a very similarly transported cocaine shipment. We readily conclude that these facts would lead a reasonable mind to believe that the plane was involved in the commission of an ongoing crime, most probably importing cocaine or other contraband.

Having established that "crime probable cause" arose before any of the challenged occurrences, we next look to the officers' knowledge of events linking Mahdi and Willis to the plane. The degree of connection required by the Constitution depends upon the extent of each investigatory intrusion and the law enforcement interests served by each. This circuit has established a three-tier analytical framework for such search and seizure inquiries. *United States v. Berry,* 670 F.2d 583 (5th Cir. Unit B 1982) (en banc).[1] Least intrusive are stops of a restricted investigative scope conducted in a non-coercive manner. These do not trigger fourth amendment protection at all. A stop becomes a seizure when, under all the circumstances of the intrusion, a reasonable, ordinary person in the suspect's position would believe he is not free to leave. *Id.* pp. 594–95. The fourth amendment permits such seizures only when supported by a reasonable suspicion based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 906 (1968). Lastly, an intrusion so much greater than a seizure as to be indistinguishable from an arrest must be supported by prob-

able cause. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). With these principles in mind, we examine the facts of this case as they were developed through the progressively more intrusive stages of investigation, then measure the officers' knowledge at each stage against the corresponding legal standard.

### 1. *Mahdi*

Dixon arrested Mahdi when he stopped him, asked for identification, and placed him in the back of the police car to be transported for questioning. *Dunaway v. New York, supra.* As we noted earlier, however, by the time of Mahdi's arrest there was probable cause to believe that the plane was involved in ongoing criminal activity, very likely the importation of cocaine. The arrest of Mahdi was constitutional because at that time police also had probable cause to believe Mahdi was connected to the illegal activity involving the aircraft. The known sources on whom police originally relied, Stettler and Moseley, were experienced airport employees who gave consistent and specific accounts of the Navajo's unusual landing. Many details of their reports were confirmed by police, and their description of Mahdi coincided with Mahdi's appearance when Dixon and Stettler saw him on the road. Stettler's identification of Mahdi as the man who had filled out the fuel order for the plane, naming both the pilot and the owner, was in these circumstances more than enough justification for the arrest.

### 2. *Willis*

Following Willis' hasty departure from Montgomery Aviation in a taxi, Brown directed a state trooper to stop the cab. Both vehicles parked on the shoulder, several miles from the airport and about half a mile from the Howard Johnson's motel. Brown soon arrived and questioned the cab driver about his fare. Not until Brown asked Willis to step out of the cab

---

1. In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit Court of Appeals adopted as precedent all deci- sions of Unit B of the former Fifth Circuit.

and frisked him for weapons, however, did a seizure take place.[2] The initial stop of the cab and questioning of Smith did not amount to a seizure because a reasonable, innocent passenger in a cab pulled over by police would assume that a traffic violation or other conduct by the driver was the cause of the stop. No ordinary person would conclude from this that he was not free to leave the scene. The inconvenience of waiting a few minutes while police talked with the driver, or even of the short walk to the motel, did not pose such significant limitations on Willis' freedom of movement as to constitute a seizure. But when Willis learned that police were actually interested in him rather than Smith, he was effectively seized. A reasonable person in his position would have remembered the unusually intense police activity at Montgomery Aviation and that he was noticed there by a police officer. He would conclude that his momentary midnight visit to Montgomery Aviation had provoked the swift interception of the cab and that he was not free to leave until he gave police a convincing explanation for his conduct at the airport.

Even as early as the stop of the cab, however, police had specific, articulable grounds for reasonably suspecting Willis' involvement with the plane. Police expected, from what Newcomb had said, that others would arrive to unload the plane. The enormous size and consequent value of the suspected cocaine shipment likewise suggested that a large conspiracy was in operation and that the other conspirators were unlikely to leave such a valuable shipment unattended for long.

Given these additional reasons to expect the arrival of co-conspirators, Willis' midnight arrival at the virtually empty ramp of Montgomery Aviation in itself might provoke reasonable suspicion. The former Fifth Circuit Court of Appeals upheld an investigatory seizure made with little more cause than Willis' arrival supplied police here. In *United States v. D'Antignac*, 628 F.2d 428 (5th Cir.1980),[3] *cert. denied*, 450 U.S. 967, 101 S.Ct. 1485, 67 L.Ed.2d 617 (1981), two officers had discovered over 28,000 pounds of marijuana on a boat at a public dock and were leaving to summon assistance via the driveway between the dock and the highway. As the police pulled onto the highway, a van approached and turned into the driveway. Based on their experience, the officers suspected that the three occupants were arriving to unload the marijuana-laden boat, which had only recently docked, and they halted the vehicle immediately after it turned. Finding the stop was valid under *Terry*, the court stressed the discovery of the marijuana, the unusually late yet relatively coincident time of the van's arrival, and the limited scope of the questioning during the seizure of the van's occupants. 628 F.2d at 434–35. *See United States v. Kreimes*, 649 F.2d 1185 (5th Cir. Unit B 1981) (where bulletin had issued for plane believed to have landed nearby, nighttime seizure of occupant of a truck on rural road without headlights was based on reasonable suspicion).

Here, the presence of cocaine on the plane was highly probable, and the time of Willis' arrival was unusually late and therefore well-suited for unobserved checking or partial unloading of the plane. Brown's questioning of Willis, though more probing than that in *D'Antignac* and accompanied by a protective weapons search, was fully justified in view of additional suspicious

---

2. This pat down for weapons was the only prudent course of action, and was therefore a permissible adjunct to the seizure under *Terry*. Brown's experience told him that approaching the unidentified occupant of a car on a relatively isolated highway and late at night was potentially dangerous, *see, e.g., Adams v. Williams*, 407 U.S. 143, 147–48, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612, 618 (1972), and also that narcotics traffickers were often armed and dangerous, *see, e.g., Michigan v. Summers*, 452 U.S. 692,

702–03, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340, 349–50 (1981). In approaching Willis, Brown subjected himself to both these risks. The frisk was reasonable and did not convert the seizure into an arrest. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

3. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

circumstances not present in *D'Antignac.* Willis' quick glance to the blocked plane, his startled turn, his seeing a police officer looking straight at him, and his immediate departure strongly pointed to his culpable knowledge of the contents of the plane. Flight from known law enforcement officials, or even merely evasive, nervous or apprehensive conduct in response to their attention, has many times been noted as a significant factor in the creation of a reasonable suspicion.[4] Also, Smith's account of Willis' stated reason for going to the airport—to meet a friend—and his unbelievable excuse for departing so suddenly—hunger—demonstrated that Willis was deliberately attempting to cover his real motive for leaving the scene. From this information police could reasonably infer not only that Willis had culpable knowledge of the plane's cargo but also that he was unusually afraid of being questioned by the authorities. These specific, articulable factors taken together amply justified a reasonable suspicion that Willis was connected to the aircraft.

■ Having decided that in seizing Willis the police acted upon a reasonable suspicion, we next turn to the time of Willis' arrest. Applying the principles enunciated in *Dunaway v. New York, supra,* we hold that when the police told Willis to empty the contents of his pockets on the motel counter, they so intruded on him as to effect an arrest requiring probable cause. This unproclaimed arrest preceded Park's formal arrests of the suspects by thirty minutes or more. The distinction makes no practical difference here because the appellants do not challenge the admission of any evidence that may have been adduced during this period. The issue is the same—whether, after Willis' identification of Newcomb, DeFranco and Ziegler, the police had

probable cause to connect Willis with the plane, and therefore to arrest him.

■ Despite the appellants' arguments to the contrary, we decline to find that an arrest of Willis was effected before he identified his co-conspirators. After frisking Willis,[5] Brown told him there was trouble at the airport and asked Willis for identification and for an explanation of his presence there. Five minutes after the cab was stopped, Ward and Rhegness arrived, spoke briefly with Brown and Smith, then read Willis his *Miranda* rights, which he said he understood. They asked him to stay there while they checked out his story at the motel. Brown, Willis and Smith then waited for about twenty minutes before Ward told them to proceed to the motel, Willis' intended destination all along. At Brown's instruction Willis paid off the cab, but Willis road the half-mile to the motel unhandcuffed and in the front seat of Brown's unmarked car.

■ Although police delayed Willis' return to his motel by twenty-five minutes, we cannot regard their asking him to remain at the point where he was stopped an arrest. In *Dunaway,* by contrast, three detectives took the suspect from a home to a police station in order to conduct a full interrogation. Here, police delayed Willis' arrival at his intended destination only long enough to make a narrow inquiry into his presence at the airport. The relative brevity of this stop distinguishes this case from those involving much longer periods of seizure. *Cf. United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (ninety minutes); *United States v. Puglisi,* 723 F.2d 779 (11th Cir.1984) (140 minutes). In a case strikingly similar to the situation here, the Supreme Court has recently reiterated that the permissible time of deten-

---

4. *E.g., Sibron v. New York,* 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917, 937 (1968); *United States v. Herzbrun,* 723 F.2d 773 (11th Cir.1984) (hasty grabbing of bag and exiting after airport officials decided to search for weapon); *United States v. Blasco,* 702 F.2d 1315, 1325 (11th Cir.1983) (suspected lookout becoming visibly upset on sighting police approaching drug offloading area); *Berry,* 670 F.2d at 603–04

(false identification and deliberate concealment of travelling companion); *United States v. Macias,* 546 F.2d 58, 61 (5th Cir.1977) (making u-turn and driving away from border checkpoint).

5. A protective search for weapons does not itself transform a seizure into an arrest. *E.g., Terry; United States v. Vargas,* 643 F.2d 296 (5th Cir. Unit B 1981).

tion without probable cause cannot be rigidly dictated by per se judicial guidelines. *United States v. Sharpe,* —— U.S. ——, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). There the Court explained:

> [W]e have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed· to effectuate those purposes. [citations]. Much as a "bright line" rule would be desirable in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.

> . . . . .

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

*Id.* at —— – ——, 105 S.Ct. at 1575. We also note that Brown drove Willis to the motel in just as unintrusive and casual a manner as Willis would have been transported in a cab. We conclude that the police did not arrest Willis until they told him to empty his pockets.

In any case, within five minutes of leaving Willis on the road, Ward and Rhegness had discovered additional evidence supplying them with probable cause to arrest him. Ward testified that only two or three minutes separated their departure for the motel and their seeing Newcomb in the motel lobby. Recognizing that Newcomb matched the linemen's description of the first pilot of the Piper Navajo, they stopped him to ask if he was a guest. He answered affirmatively, showing them a key to Room 220, one of the rooms they had just learned was rented by Willis. Even without the additional suspicious conduct and evasive replies of Newcomb, DeFranco and Ziegler, police then had probable cause to connect Willis with the plane. The subsequent arrest of Willis was supported by probable cause.

### 3. Motel records

When Ward and Rhegness arrived at the motel, they explained their purpose to the night clerk, Elizabeth Lincoln, who told them what she remembered about Willis. In response to their further inquiry, she showed them the motel's records of Willis' registration. The appellants now contend that by viewing these registration documents the agents violated Willis' fourth amendment rights. We disagree.

Although a motel guest may have a reasonable expectation of privacy in his room, *e.g., Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. Bulman,* 667 F.2d 1374, 1383–84 (11th Cir.1982), courts have refused to find such an interest in records similar to the registration records here. Thus, the Court has held that a bank depositor has no interest in the bank's records of his accounts. *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). *Accord, Reporters Comm. for Freedom of the Press v. AT & T,* 593 F.2d 1030 (D.C.Cir.1978), *cert. denied,* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979) (phone call records). We hold that Willis lacks standing to challenge the officers' examination of the motel records.

### 4. The "Navajo Panther" Cap

The appellants contend that Park's entry into Room 222 and his seizure of the cap he saw there violated their fourth amendment rights. The district court's finding that Cox knew Park was a police officer and voluntarily consented to Park's entry is not clearly erroneous. *United States v. Smith,* 649 F.2d 305, 309 (5th Cir.1981). Because the entry was constitutional, Park was permitted to seize inadvertently encountered evidence in plain view, and the cap was clearly visible to him as it sat on top of the television. *See, e.g., Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

### 5. The Buick Automobiles

The district court found that the appellants failed to demonstrate their

standing to contest the searches of the Buicks. The only evidence in any way connecting Willis or Mahdi to the cars was the government's proof that Willis had bought the cars in the name of a corporation, identifying himself as William Wilson. There was no evidence regarding the source of the money used to purchase the vehicles, nor any proof that Willis or Mahdi had ever driven or even been in the cars. The burden to establish standing was on the appellants, and they failed to carry that burden. *United States v. Torres*, 705 F.2d 1287 (11th Cir.1983); *United States v. Glasgow*, 658 F.2d 1036 (5th Cir. Unit B 1981).

*B. Miranda Warning*

The appellants claim that Willis' statement of recognition in the motel lobby was inadmissible either because Willis had not received *Miranda* warnings before he made the identifications or because, even if he did receive them, these were insufficient, in that he was not also warned he was a suspect. The district judge's finding that Ward and Rhegness administered the warnings when they spoke with Willis on the highway is not clearly erroneous. Nor were the warnings inadequate. Nothing in *Miranda* or its progeny required that Willis also be advised that he was a suspect. In *United States v. Washington*, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), the Court held that a sworn grand jury witness who had received his *Miranda* warnings prior to testifying could not later have his testimony suppressed on the ground that he had not been told he was a potential defendant. If the *Miranda* warnings are enough to caution a witness who has just sworn to tell the truth to a grand jury, then they were certainly sufficient for Willis.

*C. Brady Material*

The appellants assert that the prosecution violated its duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding certain registration records from a Fort Lauderdale Days Inn motel. These records, obtained by DEA agent Park from the FBI during the time of the suppression hearing, disclose that a room was rented in Mahdi's name from July 14 through August 9, 1983, the date Mahdi allegedly checked out. These records are within the scope of the defendants' general pretrial discovery requests.

To prevail on this sort of a *Brady* claim, the appellants must show that the prosecution either withheld or suppressed favorable evidence that would have created a reasonable doubt otherwise absent. *E.g., United States v. Benz*, 740 F.2d 903, 915 (11th Cir.1984). These documents were favorable to the defense, even though they obviously have no bearing on Mahdi's undisputed whereabouts from August 3, 1983 on, because they suggest that Mahdi flew to Montgomery from Fort Lauderdale, rather than from Colombia. Such evidence could tend to undercut the government's contention that Willis and Mahdi imported the cocaine.

But the appellants have failed to show that the prosecution withheld these records. At a post-trial *Brady* hearing, Willis' lawyers merely asserted that they "have no recollection of having seen" the documents. R.Vol. 7, pp. 2–3. Mahdi's counsel was even less certain, admitting that he had seen some papers with the Days Inn logo but saying he could not remember their substance. *Id.* pp. 21–22. There is no suggestion that any other papers bearing that logo were ever involved in this case. By contrast, both DEA agent Park and Assistant United States Attorney Truncale firmly recalled tht Park had furnished the records to all defense counsel during a recess at the pretrial suppression hearing. Both testified that the defense lawyers had circulated the records among themselves and then returned them. *Id.* pp. 10–15, 27–28. The trial court denied Willis' and Mahdi's motion for a new trial, holding that the government had not "acted improperly in any way with respect to the *Brady* materials." *Id.* p. 51. This constitutes a factual finding that the records were disclosed as recalled by Parks and Truncale. We cannot say that this finding was clearly erroneous. *Cf. United States v. Vargas*, 643 F.2d 296 (5th Cir.

Unit B 1981) (reviewing suppression hearing factfinding).

### D. Voir dire

Because the cocaine found on the plane was the largest shipment ever seized in Alabama, extensive media coverage preceded the trial. On motion of the defendants, the district judge conducted general voir dire in open court, then questioned the veniremen individually in chambers as to any prejudgments they might have made about the defendants' guilt. All attorneys for the government and the defense were present in chambers during this questioning. Willis and Mahdi now complain that they were excluded from this individual voir dire in violation of Fed.R.Crim.P. 43(a).

An inference that the defendants were not present arises only from the form of certain questions asked during the voir dire, such as: "When you saw Mr. Mahdi this morning at counsel table, could you associate his face with the picture you saw on television?" R.Vol. 10 pp. 16, 25, 28, 35. At oral argument the government stated that the defendants were indeed absent, but not because of any exclusionary action by the court. By conceding Willis' and Mahdi's absence, the government precludes the application of *United States v. Bokine,* 523 F.2d 767, 769 (5th Cir.1975), which rejected a similar Rule 43 attack because the record did not show whether the defendant had been absent when the judge communicated with the jury.

At oral argument, the appellants conceded that their absence did not result from any exclusionary action by the trial court. Nevertheless, their attorneys, who cooperated without objection during the individual voir dire process, now urge that Willis' and Mahdi's right to be present was nonwaivable. Such a strict holding would invite deliberate sandbagging of the trial court, and we decline to adopt it. *See United States v. Bascaro,* 742 F.2d 1335, 1350 (11th Cir.1984) (failure of defendants to object to their absence from informal peremptory strike conference).

 Instead, we note that under Rule 43(b)(1) a defendant once present at trial

"shall be considered to have waived his right to be present whenever [he] voluntarily absents himself after the trial has commenced." Subsection (a) denominates the impaneling of the jury as a stage of the trial. Given the appellants' presence during the general voir dire, their admission that the judge in no way excluded them from the individual voir dire and their complete failure to suggest any cause for their absence, we readily conclude that Willis and Mahdi waived their right to be present during the latter proceeding. *E.g., United States v. Gagnon,* —— U.S. ——, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam) (holding that failure by a defendant to invoke his Rule 43 right to attend a conference he knows is taking place constitutes a valid waiver); *Taylor v. United States,* 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973); *Hall v. Wainwright,* 733 F.2d 766, 775 (11th Cir.1984); *United States v. Benavides,* 596 F.2d 137, 139 (5th Cir.1979) (no suggestion by defendants that their absence was other than voluntary).

 Moreover, the appellants have failed even to suggest any prejudice arising from their absence. Their lawyers thoroughly explored the effect of pretrial publicity during four hours of individual voir dire. The defense was then granted a recess to decide how to use its peremptory strikes, and the strikes were exercised in court before the defendants. Even assuming a Rule 43 violation, the error was harmless. *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983); *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *Proffitt v. Wainwright,* 685 F.2d 1227, 1258 n. 57 (11th Cir.1982) (collecting cases), *modified on reh'g,* 706 F.2d 311, *cert. denied,* —— U.S. ——, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983); *Henderson v. United States,* 419 F.2d 1277 (5th Cir.1970). *See United States v. Bascaro,* 742 F.2d at 1350.

 Willis and Mahdi further challenge the individual voir dire on the ground that the district judge preconditioned the veniremen's responses to the questions of defense counsel. During their lengthy voir

dire, the first and second veniremen gave confusing responses, primarily because they were unsure of their duties and functions as jurors. The roundabout manner of questioning contributed to their confusion. As the third and each subsequent venireman entered the judge's chambers, the district court read instructions describing the presumption of innocence and the burden of proof. Defense counsel made no objection then, but now assert that these instructions masked the alleged bias created by pretrial publicity. We disagree, finding the judge's actions well within his broad discretion under Fed.R.Crim.P. 24. *E.g., United States v. Brunty,* 701 F.2d 1375, 1378 (11th Cir.1983). Considering that the purpose of the individual voir dire was to determine whether pretrial publicity would prevent any venireman from applying the correct standards for determining guilty or innocence, it was entirely proper to make certain that each potential juror understood the law in making that determination.

### E. *Evidentiary issues*

Willis maintains that the district court erred in admitting his statement in the Howard Johnson's lobby that he knew and recognized Newcomb, DeFranco and Ziegler as his friends with whom he had travelled to Montgomery. He now urges that the statement was inadmissible under Fed.R.Evid. 801(d)(2)(E). This argument is irrelevant in view of the fact that the district judge properly allowed the statement to be introduced as a non-hearsay admission by a party opponent. Fed.R.Evid. 801(d)(2)(A).

Counsel for Mahdi additionally complains that the district judge erred in not giving a limiting instruction before Agent Ward testified as to Willis' statement in the lobby. Defense counsel failed to request such an instruction despite the fact that an eleven minute recess intervened between the government's question and Ward's answer. Fed.R.Evid. 105. *E.g., United States v. Vitale,* 596 F.2d 688 (5th Cir.1979). Furthermore, when the government later introduced the same statement through Agent Rhegness, the defense requested and received the appropriate limiting instruction. R.Vol. 12 p. 626.

The appellants also attack, as unduly prejudicial under Fed.R.Evid. 403, the playing before the jury of a silent videotape showing police executing the search warrant for the plane. The convictions are reversible only if the district court's ruling constitutes an abuse of discretion. *E.g., Stallworth v. Illinois Central Gulf RR,* 690 F.2d 858 (11th Cir.1982); *United States v.Johnson,* 558 F.2d 744, 746 (5th Cir.1977), *cert. denied,* 434 U.S. 1065, 98 S.Ct. 1241, 55 L.Ed.2d 766 (1978). The tape was highly relevant because, among other reasons, the defendants were suggesting that the cocaine had been placed on board after the pilots' departure, by someone entering the plane before the police searched it. The defendants had tried to prove this unknown entry by showing that although only one of the plane's curtains was drawn back at midnight of August 3, 1983, the next morning two curtains were open. The videotape was highly probative of the position of the curtains at the time of the search. In any case, we do not believe that mere viewing of the duffel bags as they were found on the plane and the opening of those bags to reveal their contents threatened to inflame the jury. We find no abuse of discretion.

The appellants also take issue with the court's ruling that the defense could not elicit, through the cross-examination of Agent Anderson, Mahdi's allegedly exculpatory statements at the time of his arrest. Obviously, the defense sought to place Mahdi's remarks before the jury without subjecting Mahdi to cross-examination. This is precisely what is forbidden by the hearsay rule. On appeal, counsel for the appellants inexplicably argue that Mahdi's out-of-court statement—that he believed only mail was aboard the plane—was not hearsay because it was offered to prove only that Mahdi had no knowledge of the plane's illicit cargo. Again, this is precisely the issue on which the statements clearly would be offered for their truth, and therefore the issue on which the remarks are unquestionably hearsay. Fed.R.Evid. 802. The appellants do not suggest any hearsay exception, and we know of none.

**1502**

### F. Prosecutorial Misconduct

To bolster its contention that the plane had flown from a point outside the United States, the government presented an aviation expert who testified in part that the green gas he found in the Piper Navajo could not be obtained in this country. Overnight, defense counsel secured from a Detroit airport just this type of fuel, and they exhibited it before the jury the next day. So effective was this rebuttal that in closing argument the prosecution conceded the inaccuracy of this portion of the expert's testimony and asked the jury to reject it. No motion was made to strike the testimony.

Willis and Mahdi now urge that they are entitled to a new trial because the testimony could have affected the judgment of the jury. Even assuming this effect, we find no evidence that the prosecution introduced the evidence with any knowledge of its falsity. This is a prerequisite to relief. *E.g., Ross v. Hopper,* 716 F.2d 1528, 1533 (11th Cir.1983). The further contention that the court and the prosecution were under a duty to strike this testimony, but that the defense attorneys' failure to make such a motion is immaterial, is frivolous.

Counsel for appellants also charge that the prosecution at five points in the trial expressed personal opinions concerning the defendants' guilt. A fair reading of these statements reveals that the prosecutor merely drew logical inferences from the facts. The prosecution's description of Willis' and Mahdi's defenses as "incredible and ludicrous" was not inflammatory. The appellants additionally claim that the government several times referred to the defendants' failure to testify, but a reading of the statements in context reveals these contentions are frivolous.

### G. Reopening of the government's case

After the defendants' lawyers revealed the falsity of the prosecution's green fuel evidence, the government moved to present the testimony of two other aviation experts on the alternate grounds of rebuttal and of reopening its case. The district court granted the motion on both grounds, and the prosecution then called two witnesses who testified with respect to the plane's onboard navigation computer. Used to build flight plans, these machines store the coordinates of the last way points entered into them. This particular computer displayed a waypoint for Cancun, Mexico, which was described as the first landfall for a plane travelling north from Colombia but avoiding Cuba; a second point directly north of Cancun, near Evergreen, Alabama; a third point slightly northwest of Montgomery; and a final point near Greenland. R.Vol. 13, pp. 1030–35, 1045–46, 1096. The government represented to the court that only on the day after resting its case in chief had it realized the computer might contain such evidence. R.Vol. 13, pp. 1011, 1023.

The trial court has broad discretion in deciding whether to permit a party to reopen a case, *e.g., United States v. Molinares,* 700 F.2d 647, 652 (11th Cir. 1983), and no effort has been made to show here how Willis and Mahdi were prejudiced by the belated presentation of this proof. The government immediately informed the defense of this discovery, and defense counsel cross-examined the new witnesses thoroughly. *E.g., United States v. Marino,* 562 F.2d 941, 944 (5th Cir.1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978). We cannot say that the trial court abused its discretion in admitting the evidence.

### H. Sufficiency of the evidence

Willis and Mahdi contend that the evidence was insufficient to prove importation. The foregoing recitation of the facts before the jury indicates abundant evidence pointed to the plane's departing with its illicit cargo from Colombia. We find it more than sufficient to support the jury's verdicts on Counts 1 and 2.

### I. Jury Instructions

The appellants finally contend that the court, by instructing the jury on aiding and abetting, led the jury to believe that

even if there were insufficient evidence of conspiracy the defendants could nevertheless be convicted for conspiracy if the jury found Willis and Mahdi had aided and abetted the operation. Such an assertion flatly ignores this circuit's recent observation to the contrary. "The argument that supplying an instruction on aiding and abetting improperly reduces the government's burden of proof on conspiracy has been decisively rejected by this court." *United States v. Walker*, 720 F.2d 1527, 1542 (11th Cir.1983).

The judgments of conviction are AFFIRMED.