[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
11/02/99
THOMAS K. KAHN
CLERK**

No. 97-9137

_____

D.C. Docket No. 1:93-cr-316-1-WCO


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

NOBLE CUNNINGHAM,

Defendant - Appellant.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(November 2, 1999)**


Before EDMONDSON and CARNES, Circuit Judges, and WATSON*, Senior Judge.

_____

*Honorable James L. Watson, Senior Judge, U.S. Court of International Trade, sitting by designation.

CARNES, Circuit Judge:

A jury convicted Noble Cunningham of one count of conspiring to transport hazardous waste, in violation of 18 U.S.C. § 371, two counts of illegally transporting hazardous waste, in violation of 42 U.S.C. § 6928(d)(1) and 18 U.S.C. § 2, and one count of illegally disposing of hazardous waste, in violation of 42 U.S.C. § 6928(d)(2) and 18 U.S.C. § 2. The district court sentenced Cunningham to concurrent terms of imprisonment of 56 months on Count 1 and 24 months on Counts 2, 3 and 4, as well as three years of supervised release; the court also ordered him to pay restitution. On appeal, Cunningham contends that his conviction should be overturned because the district court made several erroneous evidentiary rulings and failed to instruct the jury properly. In addition, Cunningham argues that we should vacate his sentence because the district court misapplied the sentencing guidelines. For the reasons set forth below, we affirm Cunningham's convictions and sentence.

## I. BACKGROUND

### A. FACTS

Beginning in the late 1970s, Noble Cunningham and several members of his family operated R & D Chemical Company ("R & D Chemical"), which had offices on the Cunningham family farm in Mansfield, Ohio and in Atlanta, Georgia. Cunningham worked as a salesman for R & D Chemical, which sold a machine known as the RM-2000 Chrome Removal System ("RM-2000") to electroplating companies

in Ohio. The RM-2000 used a barium compound, known as "RD-343," to remove hexavalent chromium from rinse water generated during the electroplating process. After going through the RM-2000, the rinse water could be discharged directly into a sewer system. The RM-2000 produced a yellow sludge, known as "RD-344," that contained the barium compound and hexavalent chromium. Assuring its customers that it would collect the RD-344 and recycle it as an ingredient in paint or bricks, R & D Chemical instructed them to store the RD-344 in 55-gallon drums, which it then picked up and brought to the Cunningham farm.

In May and June of 1988, officials from the Ohio Bureau of Criminal Identification and Investigation flew over the Cunningham farm and observed approximately five hundred 55-gallon drums on the property. On July 6, 1988, officials from the Ohio Environmental Protection Agency ("Ohio EPA") executed a search warrant on the farm. During their search, they observed 496 drums containing RD-344 in a field on the property, as well as other piles of RD-344 and other drums filled with RD-344 in various buildings. Many of these drums were rusted and corroded, some were missing tops, and RD-344 was leaking onto the ground. The Ohio EPA officials collected some samples of RD-344.

During the execution of the search warrant, Cunningham told the Ohio EPA officials that R & D Chemical dried the RD-344 using an open air concrete pad and

then repackaged the material for sale. The Ohio EPA officials told Cunningham that

the RD-344 appeared to be a hazardous waste and ordered him not to move any of the

drums from the farm. The officials wore protective clothing during their visit;

Cunningham did not.

The Ohio EPA officials were concerned that RD-344 was a hazardous waste for

two reasons. First, they suspected that RD-344 might be a "characteristic waste"

under 40 C.F.R. § 261.20-.24.[1] Second, they suspected that it might be a "listed

waste" under 40 C.F.R. § 261.30-.31.[2] Cunningham contended that RD-344 was not

a solid waste, and therefore not a hazardous waste, because he recycled the material.[3]

[1] 40 C.F.R. § 261.20(a) states, in relevant part: "A solid waste . . . is a hazardous waste if it exhibits any of the characteristics identified in this subpart." 40 C.F.R. § 261.24(a) states, in relevant part: "A solid waste exhibits the characteristic of toxicity if . . . the extract from a representative sample of the waste contains any of the contaminants listed in table 1 at the concentration equal to or greater than the respective value given in that table." Table 1 lists barium as "D005." See 40 C.F.R. § 261.24, Table 1.

[2] 40 C.F.R. § 261.30(a) states, in relevant part: "A solid waste is a hazardous waste if it is listed under this subpart . . . ." 40 C.F.R. § 261.31 lists, as "F006": "Wastewater treatment sludges from electroplating operations except from the following processes: (1) Sulfuric acid anodizing of aluminum; (2) tin plating on carbon steel; (3) zinc plating (segregated basis) on carbon steel; (4) aluminum or zinc-aluminum plating on carbon steel; (5) cleaning/stripping associated with tin, zinc and aluminum plating on carbon steel; and (6) chemical etching and milling of aluminum."

[3] 40 C.F.R. § 261.3(c)(2)(1) states, in relevant part: "[A]ny solid waste generated from the treatment, storage, or disposal of a hazardous waste, including any sludge, . . . is a hazardous waste. (However, materials that are reclaimed from solid wastes and that are used beneficially are not solid wastes and hence are not hazardous wastes under this provision unless the reclaimed material is burned for energy recovery or used in a manner constituting disposal.)."

40 C.F.R. § 261.2(e)(1) states, in relevant part: "Materials are not solid wastes when they can be shown to be recycled by being: (i) [u]sed or reused as ingredients in an industrial process to make a product, provided the materials are not being reclaimed; or (ii) [u]sed or reused as effective

4

On July 11, 1988, Scott Shane of the Ohio EPA sent Cunningham a letter asking him to demonstrate that he was actually recycling the RD-344. On August 3, 1988, when Ohio EPA officials inspected the Cunningham farm a second time, Cunningham attempted to demonstrate RD-344 was not hazardous by picking up some of the material with his bare hands. Unimpressed, the inspectors told Cunningham they still considered RD-344 to be a hazardous waste. Following up on Shane's letter, they emphasized to Cunningham their belief that he was not legitimately recycling the material, and pressed him for documentation to support his claim that he was.

During the August visit, Cunningham told the Ohio EPA officials that Damman Paint Company, an Ohio paint manufacturer, had been using RD-344 as a rust inhibitor in its paints. If true, this would have supported Cunningham's claim that he was recycling the RD-344. Cunningham even gave the Ohio EPA officials a copy of a receipt indicating that Damman Paint had been using RD-344. At trial, however, Damman Paint's owner, Arnold Damman, testified that he had experimented with RD-

---

substitutes for commercial products . . . ."; 40 C.F.R. § 261.2(e)(2), however, states: "The following materials are solid wastes, even if the recycling involves use, reuse, or return to the original process (described in paragraphs (e)(1)(i) through (iii) of this section): Materials accumulated speculatively . . . ."

40 C.F.R. § 261.1(c)(8) states: "A material is 'accumulated speculatively' if it is accumulated before being recycled. A material is not accumulated speculatively, however, if the person accumulating it can show that the material is potentially recyclable and has a feasible means of being recycled; and that – during the calendar year (commencing on January 1) – the amount of material that is recycled, or transferred to a different site for recycling, equals at least 75 percent by weight or volume of the amount of that material accumulated at the beginning of the period."

5

344, concluded that it was not effective, and decided not to use it in his manufacturing process.

On September 2, 1988, the Ohio EPA sent Cunningham a letter regarding the tests performed on the samples of RD-344 taken from his farm. The letter states: "The analytical results from the samples taken on July 6, 1988, show that hazardous wastes are present onsite." The letter explained that the RD-344 sample met the characteristic of EP toxicity for barium, making it a "characteristic waste,"[4] and that it also met the definition of a "listed waste."[5]

On October 4, 1988, Ohio EPA officials conducted another inspection of the Cunningham farm. Shane reiterated to Cunningham the Ohio EPA's view that RD-344 was both a listed waste and a characteristic waste. During the October visit, Cunningham told Jennifer Hille, one of the Ohio EPA investigators, that he had met with Steve Silverman, an official at the United States Environmental Protection Agency ("EPA"), who had told Cunningham that RD-344 was not a hazardous waste. After her discussion with Cunningham, Hille spoke with Silverman, who claimed he had never met Cunningham. When Hille told Cunningham of her conversation with Silverman, Cunningham admitted that he had not met with Silverman, but claimed

---

[4] See supra note 1.

[5] See supra note 2.

they had spoken by telephone. At trial, Silverman testified that he had no recollection of ever meeting with or talking to Cunningham.

In November 1988, Cunningham informed Shane that Rose Lab of Atlanta ("Rose Lab") wanted to purchase 100 tons of RD-344 for use in manufacturing artificial fire logs. Shane told Cunningham that Cunningham would have to inform Ohio EPA of the date and quantity of every shipment of material to Rose Lab, as well as the manner in which Rose Lab intended to use the material. In a subsequent conversation, Hille reminded Cunningham that the RD-344 would have to be transported to Rose Lab in compliance with hazardous waste regulations.

At trial, the government introduced evidence that Rose Lab's purported purchase of RD-344 was a sham. In the spring of 1988, Glenn Bondurant, Rose Lab's General Manager, tried a sample of Cunningham's RD-344 in Rose Lab's manufacturing process, but was not satisfied with the results. Nonetheless, at Cunningham's request, Bondurant agreed to sign a letter, dated October 13, 1988, stating that Rose Lab was interested in purchasing RD-344. Bondurant then wrote a second letter, dated October 21, 1988, confirming a price quote on RD-344; he also prepared an invoice, dated November 4, 1988, indicating a purchase of 100 tons of RD-344 for $20,000. The government established that Cunningham accompanied Bondurant to a bank, where Cunningham supplied $5,000 in cash used by Bondurant

7

to purchase a bank check payable to R & D Chemical; this bank check gave the false appearance that Rose Lab had purchased some RD-344 for $5,000. In November 1988, Cunningham hand-delivered the check, invoice, and two letters to Hille, in an effort to demonstrate that Rose Lab was purchasing -- and therefore that he was recycling -- the RD-344.

The Ohio EPA paid another visit to the Cunningham farm in December 1988. During that visit, Cunningham produced a letter written by Thomas Carlisle, an Ohio EPA official, on April 26, 1983. In his letter, Carlisle stated that, based on the information provided to him by Cunningham, RD-344 was not a hazardous waste. At trial, the government introduced evidence that Carlisle did not conduct an independent investigation and was not a toxicologist; instead, he relied entirely on the descriptions provided to him by Cunningham.

In the spring of 1989, Bondurant allowed Cunningham to store several containers of RD-344 in Rose Lab's parking lot, even though Rose Lab was not purchasing the material. In May 1989, Cunningham and his brother, Oscar Cunningham, purchased some containers and found two drivers to carry the RD-344 from the Cunningham farm in Ohio to Rose Lab in Georgia. Each driver made six or seven trips to Rose Lab; on several of these trips, the appellant, Noble Cunningham, met the trucks and made arrangements for the containers to be unloaded in the Rose

Lab parking lot.  Eventually, Cunningham shipped 15 containers of RD-344 to Rose Lab, which did not have a permit to store, treat or dispose of hazardous waste.  When Bondurant and Gary Dodd, another Rose Lab employee, asked Cunningham about the containers, Cunningham told them he had found a buyer further south.

On June 20, 1989, Shane returned to the Cunningham farm and discovered that all of the RD-344 was gone.  The next day, he called Rose Lab and learned that 15 containers of RD-344 were in the Rose Lab parking lot.

During this time, Cunningham hired Jimmy Ray Luckey, an Atlanta truck driver, to dump the contents of one of the Rose Lab containers at the Westview Sanitary Landfill, which did not have a permit to store, treat or dispose of hazardous waste.   On June 22, 1989, the inaptly-named Luckey performed this job, but was discovered when his truck broke down.

Rose Lab filed for bankruptcy on June 1, 1989.  From August 1989 through June 1991, Thomas Mimms, the owner of the property that had been leased to Rose Lab, tried to contact Cunningham and R & D Chemical, to no avail.  In June 1991, Mimms disposed of the remaining fourteen containers of RD-344, totaling slightly over 317 tons, at a cost to him of approximately $148,000.  The RD-344 was shipped to a company called Envirite, which rendered it non-hazardous and disposed of it in a landfill.

## B. PROCEDURAL HISTORY

On July 15, 1993, a federal grand jury in the Northern District of Georgia indicted Noble Cunningham on four felony counts: (1) conspiring to knowingly transport and cause to be transported hazardous waste, in violation of 18 U.S.C. § 371; (2) knowingly transporting and causing to be transported hazardous waste to Rose Lab, in violation of 42 U.S.C. § 6928(d)(1) and 18 U.S.C. § 2; (3) knowingly transporting and causing to be transported hazardous waste to Westview Sanitary Landfill, in violation of 42 U.S.C. § 6928(d)(1) and 18 U.S.C. § 2; and (4) knowingly disposing of hazardous waste at Westview Sanitary Landfill, in violation of 42 U.S.C. § 6928(d)(2) and 18 U.S.C. § 2.[6]

In May 1997, a jury convicted Cunningham on all four counts, rejecting his argument that RD-344 was not harmful and that he had a good faith belief that it was not a hazardous waste. On September 19, 1997, the district court sentenced Cunningham to concurrent terms of imprisonment of 56 months on Count One and 24 months on Counts Two through Four, as well as three years of supervised release. The court also ordered Cunningham to pay a special assessment of $200 to the United

---

[6] R & D Chemical was indicted on all four counts; Oscar Cunningham was indicted on Counts One and Two.

States and restitution of $147,716.66 to Mimms and $10,000 to Westview Sanitary Landfill.

## II. DISCUSSION

Cunningham argues that his convictions should be overturned because the district court made six erroneous evidentiary rulings and two errors in instructing the jury. He also contends that we should vacate his sentence because the district court erroneously applied two sentencing enhancements. We address each contention in turn.

## A. EVIDENTIARY RULINGS

We review a district court's evidentiary rulings for an abuse of discretion. See United States v. Dudley, 102 F.3d 1184, 1186 (11th Cir. 1997).

### 1. Did the District Court Abuse its Discretion by Limiting Cunningham's Questioning of Thomas Carlisle?

Cunningham argues that the district court erred by not allowing him to ask Thomas Carlisle, who was the manager of the technical assistance and waste management section of the Ohio EPA's hazardous materials division, whether the type of chromium contained in listed hazardous waste F006[7] was different from the type of chromium contained in RD-344. Cunningham contends that Carlisle's testimony

---

[7] See supra note 2. The regulation lists a number of hazardous wastes; F006, which covers "[w]astewater treatment sludges from electroplating operations," is the applicable listing in this case. The sludges listed in F006 contain hexavalent chromium, a toxic form of chrome.

11

would have helped establish his defense that he had a good faith belief that RD-344 was not a hazardous waste, but Cunningham presented no evidence that Carlisle was qualified to testify about the chemical composition of the chromium in RD-344 as compared with the chromium in listed hazardous waste F006. In fact, Carlisle admitted that he was not a toxicologist and had no knowledge of the chemical composition of RD-344. Thus the district court did not abuse its discretion in preventing this line of questioning. See United States v. Zapata, 139 F.3d 1355, 1357 (11th Cir. 1998) ("A trial court has broad discretion in determining the admissibility of evidence.").

### 2. Did the District Court Abuse its Discretion by Limiting Cunningham's Questioning of Terrell Rooks?

Cunningham argues that the district court erred by not allowing him to question Terrell Rooks, who worked for the hazardous waste program of the Georgia Department of Environmental Protection, about a letter Rooks received in October 1989 from ATEC Environmental Consultants ("ATEC"). In that letter, ATEC offered its opinion that RD-344 was extremely insoluble, which would make RD-344 less likely to leach into the ground. After Rooks testified that he was not a chemist and did not know that barium chromate was insoluble, the district court ruled that the letter was hearsay and prevented Cunningham from questioning Rooks about it. See Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while

12

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Although Cunningham argues that the district court's ruling was in error, he does not explain why the letter was not hearsay nor does he contend that the letter met any of the recognized hearsay exceptions. We find no abuse of discretion in the district court's ruling. See Zapata, 139 F.3d at 1357.

### 3. Did the District Court Abuse its Discretion by Refusing to Allow Cunningham to Present the Results of Soil Samples Taken at His Farm in 1993?

Cunningham argues that the district court erred by refusing to allow him to present evidence that soil samples taken from his farm in 1993, four years after the events at issue, showed no contamination. Cunningham's lawyer made the following proffer to the district court:

> The witness will come in and say that on a date in 1993 – I can give you an exact date if you want it. But a date in 1993, he took representative samples from places on the farm, that those were sent to a lab, the lab did an analysis, the analysis came back, the analysis came back indicating that the soil did not have any characteristics of toxicity and did not indicate any listed waste.

The government responded:

> I still don't see what issue of fact it bears on, Judge. The issue is what – whether what was shipped to Atlanta in 1989 was either a listed or a characteristic hazardous waste. The condition of a farm in Ohio where that stuff had been, at least whatever the evidence is going to be on where the samples were taken, is not an issue and never has been an issue. We didn't charge – I mean, we didn't charge Ohio, we didn't charge storage, and any expert will tell you that whether you can show

13

that the soil where hazardous waste has been is still toxic four years after the fact isn't going to have any – I would think have any bearing.

Cunningham's lawyer, however, noted that the government had introduced a significant amount of evidence regarding the poor condition of his farm:

> Each time they've characterized this as the worst site they ever saw, I objected. They argued it was relevant. Your Honor let it in. I agree with the argument [the government] just made, but they have gone out of their way to prove that this was a terrible thing and it was all over the place and it was just horrible, and I think once that happens over objection, that they cannot now close the door.

The district court sustained the government's objection and refused to allow Cunningham to introduce the test results, relying in large part on the indictment having charged transportation, not storage, crimes.

Cunningham argues on appeal that the government opened the door to the introduction of the 1993 test results by introducing a significant amount of evidence regarding the poor condition of his farm, which gave the jury the prejudicial impression that he had contaminated the farm. Cunningham points to the testimony of Jennifer Hille, an Ohio EPA investigator, that his farm was "the worst site [she] had seen at that point," which was testimony admitted over Cunningham's objection. He says the 1993 test results, which indicated no contamination on his farm, would have countered the prejudicial impression created by the government.

14

The problem for Cunningham is that his proffer failed to show that the 1993 test results would have materially clarified or corrected the government's evidence. The government introduced evidence concerning the poor condition of Cunningham's farm in order to establish that Cunningham was not recycling the RD-344, which was a key issue in the case because if Cunningham had been recycling the material it would not have been a hazardous waste.[8] The government told the district court: "The condition of the site and the condition of the drums is relevant to the issue of whether this stuff is actually being recycled, which of course is the claim made by the defendant." The government did not introduce evidence about the condition of his farm in order to establish that Cunningham had contaminated the place, which was not an issue.

Although Cunningham proffered that his expert witness would testify that the soil samples revealed no contamination in 1993, he did not proffer that his expert would testify that the 1993 test results indicated that Cunningham had been storing and recycling the RD-344 properly in 1989, or even that he had not contaminated the farm in 1989. The district court and Cunningham's lawyer had the following exchange:

---

[8] See supra note 3.

15

The Court: . . . I don't profess to be an environmental expert, but there are a lot of types of products that – substances that could cause damage to the soil or toxicity to the soil that would, by natural processes, work out in four, five years, four years time.

[Cunningham's lawyer]: Whether there is such evidence or not, I guess the problem becomes with that –

The Court: There's some that wouldn't. As I understand, what I've heard, there's some things, once they're in there, they're there until they're physically removed.

[Cunningham's lawyer]: And we won't be able to – until I have an expert that they have called to testify –

During this discussion, Cunningham should have made a proffer – if he could ethically do so -- indicating that his expert would testify the 1993 test results indicated that Cunningham had been storing and recycling the RD-344 properly in 1989, or at least that he had not contaminated the farm in 1989. Cunningham did not proffer that critical link between the 1993 test results and the condition of the farm in 1989.

Had we been sitting as district court judges, we might have allowed Cunningham to introduce the 1993 test results anyway. But our job as an appellate court is to determine whether the district court abused its discretion, not whether we would have admitted or excluded evidence ourselves. See Zapata, 139 F.3d at 1357 ("A trial court has broad discretion in determining the admissibility of evidence."); In re Rasbury, 24 F.3d 159, 168 (11th Cir. 1994) ("[U]nder the abuse of discretion standard of review there will be occasions in which we affirm the district court even

16

though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a <u>de</u> <u>novo</u> standard of review."). Because Cunningham did not make a more adequate proffer, we cannot say that the district court abused its discretion by refusing to allow him to introduce the results of the 1993 soil samples. <u>See also</u> <u>Piamba Cortes v. American Airlines, Inc.</u>, 177 F.3d 1272, 1305-06 (11th Cir. 1999) ("[E]videntiary rulings will be overturned only if the moving party establishes that the ruling resulted in a substantial prejudicial effect.") (quotation and citation omitted). Cunningham had ample opportunity to make such a proffer, but failed to do so.

### 4. Did the District Court Abuse its Discretion by Limiting Cunningham's Questioning of Joe Stillwell?

Cunningham argues that the district court erred by refusing to allow him to question Joe Stillwell, who worked as Rose Lab's Plant Manager, about his opinion as to whether RD-344 was a hazardous waste or was harmful to the environment. The government called Stillwell to testify about Rose Lab's determination that it could not use RD-344 in its manufacturing process and about the delivery of the containers to the Rose Lab premises. On cross-examination, Cunningham's lawyer established that Stillwell had an undergraduate degree in chemistry, and that Cunningham had told Stillwell that RD-344 was a non-hazardous material. When Cunningham's lawyer then

17

asked Stillwell for his opinion as to whether RD-344 was hazardous, the government objected.

The court excused the jury and allowed Cunningham to make a proffer of Stillwell's testimony. Stillwell explained that he had spoken with Cunningham and Glenn Bondurant, Rose Lab's General Manager, about whether RD-344 was hazardous. Cunningham's lawyer and Stillwell then had the following exchange:

Q. Based on all of those factors taken into account, had you expressed an opinion that the waste, that is, the material, was not hazardous?

A. Yes.

Q. And have you further expressed the opinion specifically to agents of the government that you were convinced the waste was not hazardous, that the E.P.A.'s determination of the waste being hazardous was bullshit, and that the E.P.A. did not have a leg to stand on in this area?

A. I did say that.

Q. All right. Now, would you tell us why it is in your own words – without me putting words into your mouth, why that would be your opinion?

A. You can't dissolve the material in hydrochloric acid, which we tried. I didn't see any reason for it to be hazardous.

Stillwell explained that he performed his hydrochloric acid test out of "curiosity" and that he did not take anything else into account in reaching his opinion that RD-344 was not hazardous. The district court sustained the government's objection to Stillwell's testimony.

18

On appeal, Cunningham makes two arguments to support his contention that the district court erred in limiting his examination of Stillwell. First, Cunningham argues that Stillwell's testimony would have countered the testimony of three government witnesses -- Jennifer Hille, Paul Blazis, and Michael Wasko – which he characterizes as testimony that RD-344 had the potential to be harmful to the environment. Had these witnesses testified that RD-344 had contaminated the ground under the Ohio farm, or that RD-344 was soluble, then Stillwell's opinion might have been relevant. But they did not. They simply testified that Cunningham had not properly recycled the RD-344, or that the RD-344 taken from Cunningham's farm contained a significant amount of barium. Stillwell's opinion regarding the solubility of RD-344 in hydrochloric acid would not have countered or rebutted that testimony.

Second, Cunningham argues that Stillwell's testimony would have established that RD-344 was harmless and would have bolstered Cunningham's contention that he possessed a good faith belief that RD-344 was harmless. But Cunningham failed to establish the reliability of Stillwell's proffered testimony under the standards laid out by the Supreme Court in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), and Kumho Tire Company, Ltd. v. Carmichael, 119 S. Ct. 1167 (1999). In Daubert, the Supreme Court stressed that the trial judge must

19

make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue" and that the "overarching subject [of this assessment] is the scientific validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission." Daubert, 509 U.S. at 592-95, 113 S. Ct. at 2796-97. In Kumho Tire, the Court held that the Daubert standard applied to non-scientific expert testimony and reemphasized that the trial judge must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 119 S. Ct. at 1174-76.

When Cunningham sought to introduce Stillwell's opinion, the government argued that Cunningham had failed to lay a proper foundation and had produced no evidence of the scientific reliability of that opinion. The court then allowed Cunningham to make a proffer of Stillwell's testimony, which included the basis for Stillwell's opinion. After the government cross-examined Stillwell, the district court sustained the government's objection and prevented Cunningham from questioning Stillwell about his opinion.

In its cross-examination of Stillwell, the government established that Stillwell had based his opinion on an unproven testing method, was unfamiliar with the relevant regulations and disagreed with the EPA's regulatory determination that barium was a hazardous waste. Thus, Cunningham failed to demonstrate that "the reasoning or methodology underlying" Stillwell's opnion was "scientifically valid." Daubert, 509 U.S. at 592-93, 113 S. Ct. at 2796. Accordingly, the district court did not abuse its discretion by preventing Cunningham from questioning Stillwell about that opinion. See Zapata, 139 F.3d at 1357 ("A trial court has broad discretion in determining the admissibility of evidence.").

### 5. Did the District Court Abuse its Discretion by Preventing Cunningham from Challenging the Validity of the EP Toxicity Test?

In June 1991, the EPA took samples of RD-344 from the containers stored at Rose Lab. Later that month, the EPA laboratory in Athens tested the samples to determine whether RD-344 possessed a sufficient level of barium to be classified as a "characteristic waste" on the basis of its toxicity.[9] Because the EPA had changed the applicable test in 1990, the Athens lab tested the sample of RD-344 under both the old test, known as the EP toxicity test, and the new test, known as the Toxicity

---

[9] See supra note 1.

21

Characteristic Leaching Procedure (TCLP) test. The tests produced statistically similar results.

After hearing extensive argument from both sides, the district court determined that the government should be allowed to introduce the results of the EP toxicity test, which was the test in effect at the time of the events at issue in this case. The government did introduce the results of that test, which indicated that the sample of RD-344 far exceeded the regulatory limit for barium. Although the district court ruled that Cunningham could not introduce evidence that the EP toxicity test was scientifically invalid because it had been changed, the court did instruct the jury that the test had been changed.[10]

---

[10] The court stated:

I think it's appropriate that I explain to the jury at this point that the regulations dealing with this subject matter that were in existence in 1989 are the regulations that would control because that's when this took place, and part of this is what has caused some delays in the court's determinations.

Subsequent thereto, there have been some changes in the regulations that specify the method of testing, and the court has ruled that you must apply the regulations as they existed in 1989, even though the testing may have been done at a later time when the method of testing at that time was different than it was in '89. You must use the standards that were applied in '89, not some subsequent time.

So, if you see some difficulty in the examination between the lawyer and the witness as to the period of time and the standards, that's the reason. I've required and have ruled that they cannot use any standards of any other period other than the standards of 1989, and that was what must – the chemist must utilize. So that you understand part of what some of the difficulty in time has been in dealing with this, and to the extent they use – I believe you're questioning now to the extent that they used the standards as prescribed by the regulations for 1989 even though it was being done

22

Cunningham argues on appeal that he should have been allowed to introduce evidence that the EP toxicity test was invalid because it had been replaced by the TCLP test. An examination of the rationale behind the EPA's decision, however, indicates that it did not replace the EP toxicity test because that test was invalid; instead, the TCLP test was adopted because it was faster and produced results that classified more -- not fewer -- materials as hazardous waste. The EPA promulgated the TCLP test after Congress directed it to devise a more aggressive test, i.e., one that would detect more hazardous waste. See 42 U.S.C. § 6921(g) (directing EPA to make changes to the EP toxicity test "to insure that it accurately predicts the leaching potential of wastes which pose a threat to human health and the environment when mismanaged"); 55 Fed. Reg. 11798, 11800 (Mar. 29, 1990) ("Congress intended for EPA to develop a more aggressive leaching medium for the test . . . ."); see also Edison Electric Institute v. United States Environmental Protection Agency, 2 F.3d 438, 442 (D.C. Cir. 1993) ("The legislative history indicates that Congress believed that EPA's test was deficient because it was underinclusive in identifying hazardous wastes.").

_____

at a time when another standard had been adopted.

When it proposed the adoption of the TCLP test, the EPA made clear that it did not consider the EP toxicity test to be scientifically invalid. See 51 Fed. Reg. 21648, 21653 (June 13, 1986) ("It is important to note that the purpose of the EP [toxicity test], as well as this new method, is as a means of determining whether a waste, if mismanaged, has the potential to pose a significant hazard to human health or the environment due to its propensity to leach toxic compounds. EPA believes that the EP [toxicity test] adequately accomplished this goal for the currently regulated toxicants."). In fact, the EPA allowed for the continued use of the EP toxicity test. See 55 Fed. Reg. 11798, 11848 (Mar. 29, 1990) ("[U]se of the EP [toxicity test] in addition to the TCLP may continue to be required as a matter of state law."); Edison Electric, 2 F.3d at 451 (noting that EPA retained the EP toxicity test for certain inorganic constituents).

The district court did not abuse its broad discretion by preventing Cunningham from challenging the validity of the EP toxicity test solely because another test had been developed. "The mere fact that regulations were modified, without more, is simply not enough to demonstrate that the prior regulations were invalid." LaRouche v. Federal Election Commission, 28 F.3d 137, 141 (D.C. Cir. 1994). See also Pettibone Corp. v. United States, 34 F.3d 536, 540-42 (7th Cir. 1994) (applying

version of IRS regulation in effect during relevant tax years, as opposed to new version of same regulation, because old version has not been rendered obsolete).

### 6.  Did the District Court Abuse its Discretion by Preventing Cunningham from Introducing his Post-Arrest Statement?

During the trial, Jeff Balzer, a Deputy U.S. Marshal, described the process of arresting Cunningham, which included Cunningham's refusal to come to the door of his apartment after the marshals had identified themselves, Cunningham's attempt to hide by crouching inside the apartment, and Cunningham's refusal to identify himself once the marshals had arrested him.   The government argued that Cunningham's actions were evidence of flight and evasion of arrest, which were indicative of guilt.

On appeal, Cunningham argues that the district court abused its discretion by refusing to allow him to question Balzer about a statement Cunningham made during the arrest.  Cunningham's lawyer told the district court that he wanted to question Balzer because "[a]t some point he has a conversation with [Cunningham], that is, according to his reports, in which, when he reads [Cunningham] the charges against him, and my client says, 'Oh, I thought that that was over with.  They let Oscar go.'" The government objected on hearsay grounds, and the district court sustained the objection.  The next day, Cunningham's lawyer elaborated on what the excluded testimony would have been:

The subject, that is, Mr. Cunningham, stated that he did not understand why he was under arrest. Balzer read the charges on the warrant to the subject. The subject stated that he was familiar with the charges and the case that was referred to in the warrant. The subject stated that he could not be charged with conspiracy as charged in the warrant because the charges had been dropped against his brother Oscar. The subject advised that he thought the case was over since Oscar had been let go.

I would have brought that out on the issue of course as to what Mr. Balzer had testified, which was the question of flight. I consider this to be highly relevant evidence on the issue of flight since it explains why the defendant, in our opinion, was not in the midst of flight, and therefore consciousness of guilt would have been – is an inappropriate inference to draw from that because he thought the case was over with.

Cunningham's argument is foreclosed by United States v. Willis, 759 F.2d 1486 (11th Cir. 1985), in which we held that a defendant cannot attempt to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination. In rejecting the defendant's argument in that case, we explained that "the defense sought to place [the defendant's] remarks before the jury without subjecting [him] to cross examination. This is precisely what is forbidden by the hearsay rule." Id. Nevertheless, Cunningham argues that his statement fits the hearsay exception contained in Federal Rule of Evidence 803(3), because it demonstrates his then-existing state of mind. Cunningham fails to note that Rule 803(3) explicitly excludes "a statement . . . of belief to prove the fact . . . believed," which describes Cunningham's statement and his motive for seeking its introduction.

### B. JURY INSTRUCTION ISSUES

26

We now turn to Cunningham's contention that we should reverse his convictions because the district court erroneously instructed the jury. Cunningham raises two objections to the court's jury instructions, and we review each for an abuse of discretion. See United States v. Mejia, 82 F.3d 1032, 1037 (11th Cir. 1996) (abuse of discretion review applied to supplemental instructions); United States v. Morris, 20 F.3d 1111, 1114 (11th Cir. 1994) (abuse of discretion review applied to failure to give a requested instruction). We conclude that the district court acted within its discretion on both issues.

First, Cunningham argues that the district court erroneously responded to a question from the jury. During its deliberations, the jury asked the court to clarify its instruction about the definition of "recycling," and the court did so. Cunningham contends that the district court's reinstruction led the jury away from the good faith defense, one of his central defenses at trial, because the court failed to remind the jury that Cunningham only needed to possess a good faith belief that the RD-344 was being recycled.

Cunningham's argument is meritless. The court answered the jury's question accurately. Moreover, it took pains to ensure that it did not present a misleading picture by reminding the jury to consider the supplemental instruction in the context of all the jury instructions. We have approved that approach in prior decisions. See

27

Mejia, 82 F.3d at 1037 ("It is also settled that the judge may sometimes simply refer the jury back to his earlier instructions."); United States v. Sanfilippo, 581 F.2d 1152, 1154-55 (5th Cir. 1978) ("As long as the combined directions accurately present the controverted point of law, ordinarily no reviewable error exists."). Because the jury did not ask for clarification of the good faith defense, the district court did not abuse its discretion by failing to reinstruct the jury on that issue.

Second, Cunningham argues that the district court erred by refusing to give his proposed instruction regarding the definition of "reclaimed materials." The district court initially instructed the jury: "Now, a material is reclaimed if it is processed to recover a usable product or if it is regenerated. A material is recycled if it is used, reused, or reclaimed." After the court delivered this instruction, Cunningham's lawyer objected that the court had failed to instruct the jury that "materials that are reclaimed from solid waste and that are used beneficially are not solid wastes and, hence, are not hazardous waste under this provision." Cunningham's lawyer admitted that, although he had requested the instruction during an informal charge conference the night before, he had not submitted a written request for this instruction. The court overruled the post-instruction objection.

On appeal, Cunningham argues that the district court abused its discretion by not giving his instruction regarding the definition of "reclaimed materials." As an

28

initial matter, Cunningham's lawyer did not make a written request for this instruction, as required. See Fed. R. Crim. P. 30; N.D. Ga. L. Crim. R. 30.1. Because the request for this instruction was not made in the proper form, the district court acted within its discretion in refusing to give it. See United States v. Johnson, 713 F.2d 633, 652-53 (11th Cir. 1983) (affirming district court's refusal to give untimely instruction).

Even if the request had been properly made, Cunningham still would not prevail on this matter. "A refusal to give a requested theory of defense instruction is reversible error only if the requested instruction (1) was correct, (2) was not substantially covered by the court's charge to the jury, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." Morris, 20 F.3d at 1115-16 (citations and quotations omitted). While Cunningham's requested instruction was a correct statement of the law, the subject matter of the requested instruction was substantially covered by the court's overall charge to the jury. See United States v. Thomas, 8 F.3d 1552, 1562 (11th Cir. 1993); United States v. Freyre-Lazaro, 3 F.3d 1496, 1504-05 (11th Cir. 1993). Any lingering concern about the completeness of the court's instructions was eliminated when it reinstructed the jury on the definition of "recycling":

29

A material is recycled – and this is the language from the regulations – if it is used, reused, or reclaimed. Now, a material is reclaimed if it is processed to recover a usable product or if it is regenerated. Material is used or reused if it is employed or used as an ingredient in an industrial process to make a product.

This reinstruction was a clear and concise statement of the proper definition.

## C. SENTENCING ISSUES

Finally, we turn to Cunningham's contention that we should vacate his sentence because the district court misapplied the sentencing guidelines. Cunningham was sentenced under United States Sentencing Guideline ("U.S.S.G.") § 2Q1.2, the guideline governing the unlawful transportation of hazardous substances. He argues that the district court improperly applied two enhancements to his sentence. "We review the factual findings of a district court at sentencing for clear error, and review its interpretation of the Sentencing Guidelines de novo." United States v. Eidson, 108 F.3d 1336, 1344 (11th Cir. 1997).

### 1. Did the District Court Err in Applying the 2Q1.2(b)(1) Enhancement?

The district court gave Cunningham a six-level enhancement under U.S.S.G. § 2Q1.2(b)(1), which states:

(A) If the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a hazardous or toxic substance or pesticide into the environment, increase by 6 levels; or

(B) If the offense otherwise involved a discharge, release, or emission of a hazardous or toxic substance or pesticide, increase by 4 levels.

U.S.S.G. § 2Q1.2(b)(1). At the sentencing hearing, Cunningham's lawyer conceded that "the evidence would certainly justify the finding that it was continuous." As this concession indicates, § 2Q1.2(b)(1)(A) was the applicable provision in this case.

Application Note 5 for § 2Q1.2 states:

> Subsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination. A wide range of conduct, involving the handling of different quantities of materials with widely different propensities, potentially is covered. Depending upon the harm resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation, a departure of up to two levels in either direction from the offense levels prescribed in these specific offense characteristics may be appropriate.

U.S.S.G. § 2Q1.2, Application Note 5. Cunningham argues that the district court erred in giving him this enhancement, because Note 5 requires the government to prove that his actions caused actual environmental contamination. He bases his argument on the first sentence of Note 5, contending that the guideline assumes that the government has demonstrated a discharge resulting in actual environmental contamination. The government reads Note 5 differently, arguing that the guideline assumes actual environmental contamination if the text of § 2Q1.2(b)(1) itself is met; that is, if the government has demonstrated a discharge, release or emission of a hazardous substance. Under that reading, the government need prove nothing more than that the defendant's conduct fit the language of the guideline.

31

This issue has caused a split in the circuits. Compare United States v. Liebman, 40 F.3d 544, 550-51 (2d Cir. 1994) (proof of actual environmental contamination not required), and United States v. Goldfaden, 959 F.2d 1324, 1331 (5th Cir. 1992) (same), with United States v. Ferrin, 994 F.2d 658, 663 (9th Cir. 1993) (showing of actual contamination required). We join the Second and Fifth Circuits in holding that Note 5 does not impose any additional requirements on the application of the § 2Q1.2(b)(1) enhancement beyond those contained in the guideline itself. The government does not have to prove actual environmental contamination in order for the enhancement to apply. As the Fifth Circuit stated:

> [W]e interpret the commentary to explain that subsection (b)(1) takes environmental contamination as a given, but allows for upward or downward departures depending on the potency, size, or duration of the contamination.

Goldfaden, 959 F.2d at 1331; see also Liebman, 40 F.3d at 550-51 ("The application note states the obvious – that when a hazardous or toxic substance is discharged into the environment, it will be assumed that contamination of that environment ordinarily ensues.").

Having rejected Cunningham's argument that the government needed to prove actual environmental contamination, we conclude that the district court properly applied the § 2Q1.2(b)(1) enhancement. At the sentencing hearing, Cunningham did not dispute that the government had proven that his offenses "resulted in an ongoing,

continuous, or repetitive discharge, release, or emission of a hazardous or toxic substance or pesticide into the environment." U.S.S.G. § 2Q1.2(b)(1). Indeed, his lawyer conceded that he could not "dispute the fact that there has been actual contact. I mean, clearly, RD-344 was found on the ground in some respects up in Ohio, and, clearly, as found by the jury, there has been the disposal, that is, in the one landfill, of RD-344." It follows that the district court properly enhanced Cunningham's sentence.

### 2. Did the District Court Err in Applying the 2Q1.2(b)(3) Enhancement?

The district court also gave Cunningham a four-level enhancement under U.S.S.G. § 2Q1.2(b)(3), which states:

> If the offense resulted in disruption of public utilities or evacuation of a community, or if cleanup required a substantial expenditure, increase by 4 levels.

U.S.S.G. § 2Q1.2(b)(3). Application Note 7 for this guideline states:

> Subsection (b)(3) provides an enhancement where a public disruption, evacuation or cleanup at substantial expense has been required. Depending upon the nature of the contamination involved, a departure of up to two levels either upward or downward could be warranted.

U.S.S.G. § 2Q1.2, Application Note 7. While Cunningham does not dispute that the cleanup of the RD-344 required a substantial expenditure, he argues that this expenditure was not related to contamination. He bases this argument on his claim

33

that there was no actual contamination, and the fact that the company eventually hired to remove the RD-344 disposed of it in a regular landfill after adding lime and water.

Cunningham's argument is meritless. Nothing in the language of the guideline limits its application to the costs of contamination cleanup per se; instead, it extends to any cleanup related to the offense. For the purposes of applying this enhancement, Cunningham's relevant offense was the illegal transportation of hazardous waste to Georgia. The owner of the land in Georgia on which Cunningham abandoned the hazardous waste had to pay $147,716.66 to dispose of the waste properly, i.e., to clean it up. Thus, Cunningham's conduct meets the plain language of the enhancement – the "cleanup [of Cunningham's offense] required a substantial expenditure." See United States v. Bogas, 920 F.2d 363, 369 (6th Cir. 1990) (expenditure of more than $100,000 was substantial). The relative simplicity of the technique used by the hazardous waste removal company does not mean that RD-344 was not hazardous, nor does it mean the cleanup of Cunningham's offense did not require a substantial expenditure.

## III. CONCLUSION

AFFIRMED.